UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

———————————————— x
LAURA DEVLIN, Individually and on Behalf :   Civil Action No. __
of All Others Similarly Situated,               :
                                          :   CLASS ACTION COMPLAINT FOR
                      Plaintiff,   :   VIOLATIONS OF THE FEDERAL
                                          :   SECURITIES LAWS
    vs.                                 :
                                          :
EQUITABLE FINANCIAL LIFE         :
INSURANCE COMPANY,               :
                                          :
                    Defendant.   :
                                          :
———————————————— x   <u>DEMAND FOR JURY TRIAL</u>

# TABLE OF CONTENTS

I.     INTRODUCTION ..................................................................................................1

II.    PARTIES ...............................................................................................................2

    A.    Plaintiff ....................................................................................................2

    B.    Defendant .................................................................................................3

III.   JURISDICTION AND VENUE ...........................................................................3

IV.   BACKGROUND ..................................................................................................4

    A.    Overview of Retirement Plans for Public School Teachers and Employees of Non-Profit Organizations ...................................................4

    B.    Investment Products Available Inside 403(b) and 457(b) Plans ............5

    C.    The 403(b) Marketplace..........................................................................7

    D.    Defendant's EQUI-VEST Annuities .....................................................10

    E.    Defendant Issues Misleading Account Statements to Variable Annuity Investors ...............................................................................................10

    F.    Defendant's EQUI-VEST Product Features Some of the Highest Fees in the Industry ...........................................................................................13

    G.    SEC Charges Defendant with Securities Fraud ....................................15

V.    ADDITIONAL INDICIA OF SCIENTER .......................................................16

VI.   CAUSATION/RELIANCE ................................................................................18

VII.  LOSS CAUSATION/ECONOMIC LOSS ........................................................19

VIII. CLASS ACTION ALLEGATIONS ..................................................................19

IX.   CLAIM ALLEGED ...........................................................................................21

X.    REQUEST FOR RELIEF ..................................................................................22

XI.   DEMAND FOR JURY TRIAL..........................................................................23

## I.        INTRODUCTION

1.        This is a class action brought on behalf of investors in EQUI-VEST variable annuities against Equitable Financial Life Insurance Company ("Defendant" or "Equitable") for violations of the federal securities laws.  For years, Equitable charged investors—most of whom are teachers or other employees of kindergarten through twelfth-grade ("K-12") public school districts—significant undisclosed fees on their EQUI-VEST variable annuities, held within 403(b) or 457(b) supplemental retirement savings plans, in violation of §10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §78j(b), and Rule 10b-5, promulgated thereunder, 17 C.F.R. §240.10b-5.

2.        As more fully explained below, Defendant has consented to the entry of a U.S. Securities and Exchange Commission ("SEC") order in which the SEC found that Defendant issued misleading account statements to more than 1,000,000 variable annuity investors.  This conduct led investors to increase their contributions to the EQUI-VEST variable annuities or caused them to move additional dollars from existing 403(b) plans and individual retirement accounts ("IRA") products as an exchange, plan transfer, or rollover-in.

3.        The United States is home to 3.8 million full- and part-time public-school teachers, including 1.9 million elementary school teachers and 1.9 million secondary school teachers.  For most of them, the funds provided by retirement programs for a lifetime of academic service, whether by pension or otherwise, will be insufficient to fund their retirement.

4.        As a result, for many years, teachers have turned to supplementing their retirement saving with personal retirement savings plans.  Often, these educators invest in plans offered under 26 U.S.C. §403(b), which allows public schools and 501(c)(3) non-profits to offer employees tax-advantaged employer-sponsored retirement plans.

- 1 -

5.      Millions of teachers across the United States participate in defined contribution plans, such as 403(b) and 457(b) plans, and over $1 trillion is currently invested in securities offered within these 403(b) and 457(b) plans.  Public school teachers also have substantial assets in defined benefit plans.  By some estimates, teacher retirement assets (in both defined benefit and defined contribution plans) aggregate to over $2 trillion.

6.      Over the course of several years, Defendant—a nationwide insurance and annuity company and one of the largest 403(b) vendors—misled investors in its EQUI-VEST variable annuities about the fees and costs associated with that product.

7.      Since at least 2016, through at least the first half of 2022, Defendant's account statements excluded the most significant fees that investors paid on their accounts.  Instead, the account statements listed as fees only certain types of administrative, transaction, and plan operating fees—most often amounting to zero or a very small number—which were, in fact, only a slight fraction of the overall fees paid by the investor.

8.      Defendant's conduct has enabled it to thrive in the 403(b) market for public school teachers.  By hiding its fees, Defendant has lured unsuspecting teachers into its poorly performing products and away from better products sold by competing vendors.

9.      Plaintiff Laura Devlin ("Plaintiff") is such a teacher.  Plaintiff incurred thousands of dollars in fees within Defendant's poorly performing variable annuities.

## II.      PARTIES

### A.      Plaintiff

10.      Plaintiff Laura Devlin is a resident of Elgin, Illinois.  She has served as an English teacher at Huntley High School for the past 21 years, in Consolidated School District 158.  As set forth in the attached certification, Plaintiff opened an EQUI-VEST variable annuity contract in

2003 through her school district's 403(b) plan and made contributions to that annuity through October 2021. While holding that annuity, she incurred fees and charges within this product that Defendant failed to disclose in its quarterly statements.

### B. Defendant

11. Defendant Equitable Financial Life Insurance Company is a New York company, incorporated in New York and with its principal place of business in New York, New York. Equitable's primary business is providing variable annuity, life insurance, and employee benefit products to both individuals and businesses. It is an insurance company that enters into variable annuity contracts with investors, issuing quarterly account statements to them. Prior to June 2020, Equitable was known as AXA Equitable Life Insurance Company.

12. Equitable describes itself as the "#1 provider of 403(b) plans for K-12 schools," with "products and services . . . designed to meet the unique needs of educators." It markets itself as a company that "understand[s] teachers," helping them "invest wisely."

13. Equitable operates across the United States. Since at least 2016, more than 1,000,000 investors have purchased or added to its EQUI-VEST variable annuities within a 403(b) or 457(b) defined contribution retirement plan. Most of these investors are teachers or other employees of K-12 public school districts.

### III. JURISDICTION AND VENUE

14. The claims asserted herein arise under §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5, promulgated thereunder, 17 C.F.R. §240.10b-5. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act, 15 U.S.C. §78aa.

15. This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332(d)(2), as amended by the Class Action Fairness Act of 2005, because: (a) there are at least 100 class members; (b) the matter in controversy exceeds $5 million, exclusive of interest and costs; and (c) at least one plaintiff is a citizen of a different state than at least one defendant.

16. This Court has personal jurisdiction and venue over Defendant under §27 of the Exchange Act, 28 U.S.C. §1391(b) and 18 U.S.C. §1965(a) because Defendant conducts business, including advertising and selling variable annuity products, in this District. Venue is also proper in this District under 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to the claims at issue occurred in this District and because Defendant is subject to the personal jurisdiction of this Court. Moreover, Plaintiff and the broker who sold Plaintiff her EQUI-VEST variable annuity reside in this District.

## IV. BACKGROUND

### A. Overview of Retirement Plans for Public School Teachers and Employees of Non-Profit Organizations

17. Most Americans who save for retirement at work have 401(k) plans, which are generally offered by companies and, by law, must provide a mix of prudent investment options. But millions of Americans—including public school teachers, clergy members, employees of religious institutions or non-profits, and some charities—are not offered 401(k)s. Instead, they typically rely on what are known as 403(b) or 457(b) plans.

18. Public-sector and non-profit organizations offer two types of employer-sponsored plans, the 403(b) and the 457(b), to help fund an employee's retirement. These plans function similarly to a private employer's 401(k) plan and serve as a supplement to a traditional pension plan or other retirement plan(s), or as a stand-alone plan. 403(b) and 457(b) plans have increasingly played a more important role in paying for workers' retirement for several reasons.

- 4 -

First, teachers in about a dozen states may not qualify for Social Security. Second, while public teachers are often offered pensions, many of them do not work for the decades of service it requires to qualify for a full payout. And pension formulas have become less generous for newer teachers.

19. The 403(b) plan is a retirement tool available to employees of educational institutions and certain non-profit organizations as determined by §501(c)(3) of the Internal Revenue Code. Contributions can be made on a pre-tax or Roth basis. The 403(b) plan is named after the section of the Internal Revenue Services ("IRS") code governing it. IRS Publication 571 provides details on the plan.

20. Employees of tax-exempt organizations established under §501(c)(3) of the Internal Revenue Code are eligible to participate in 403(b) plans.

21. Employees enroll and participate through their employer. Contributions to a 403(b) plan are made through a Salary Reduction Agreement. This is an arrangement where the participating employee agrees to take a reduction in salary. The amount by which the salary is reduced is directed to investments offered through the employer and selected by the employee. These contributions are called elective deferrals and are excluded from the employee's taxable income.

22. The 457(b) plan is offered by state and local government agencies, as well as certain non-profits. Contributions are deducted from an employee's paycheck and grow tax-free while they are held in the account.

**B.     Investment Products Available Inside 403(b) and 457(b) Plans**

23. Employers who sponsor the plans make available one or more vendors or financial firms, which in turn offer a number of investment options that 403(b) or 457(b) participants can use to fund their 403(b) plans.

24. In 1961, the insurance industry introduced the "tax-sheltered annuity" or "TSA." Between 1961 and 1974, only TSAs were allowed in 403(b) plans.

25. In 1974, Congress passed the Employee Retirement Income Security Act ("ERISA"), allowing mutual funds to be used within 403(b) plans.

26. Currently, there are two categories of investment products available for 403(b) plans: (i) annuities; and (ii) mutual funds.

27. A mutual fund is an investment that pools money from many participants and invests in stocks, bonds, short-term money-market instruments, or some combination of the three. The combined holdings of stocks, bonds, or other assets that the fund owns are known as its portfolio. Each investor in the fund owns shares, which represent a part of these holdings.

28. Annuity products used to fund such defined contribution retirement plans include fixed, equity indexed, and variable annuities. As explained below, the type of product at issue in this action is a variable annuity, which is a contract between a person and an insurance company. A person purchases a variable annuity contract by making either a single purchase payment or a series of installment payments. In exchange for an upfront payment or a set of installment payments, the issuer provides a named annuitant, usually the contract owner, a future lump-sum payout or a series of payouts.

29. A variable annuity offers a range of investment options, such as mutual funds that invest in stocks, bonds, short-term money-market instruments, or some combination of the three. These investment options are referred to as the sub-account. The value of the investment will vary depending on the performance of the investments in the sub-account.

30.     Variable annuities are arguably the most complex individual retirement planning product in the financial market because they combine traditional life and annuity products with added financial options.

31.     When you purchase a variable annuity, the money paid is allocated to an investment portfolio with a range of options (sub-accounts).  A variable annuity offers a range of investment options.  The value of your investment as a variable annuity owner will vary depending on the performance of the investment options the investor has selected.  The investment options for a variable annuity are typically mutual funds that invest in stocks, bonds, money market instruments, or some combination of the three.  An investor can also decide to start, stop, increase, or decrease their contributions to the variable annuity.

### C.     The 403(b) Marketplace

32.     When saving and deciding how to fund their retirement, teachers and other public-school workers usually see investment options from several large providers, with a dizzying array of prospective investments, many of which are lightly regulated because the investments are not subject to the more stringent federal rules and plan participant protections generally found in ERISA, which applies to 401(k) plans.

33.     Millions of teachers and employees at non-profits rely on 403(b) plans for their retirement savings.  Of the nearly $1 trillion in total 403(b) assets, more than half are ***not*** subject to federal retirement plan rules and protections of ERISA, which impose strict fiduciary and disclosure duties on sellers of such products.

34.     Not surprisingly, then, teachers have increasingly been sold investment products inside their 403(b) plans that feature high fees.  These fees matter to investors because they can be

devastating to retirement plan balances, slicing in half the ending balance for the investor by retirement age.

35.     The United States Government Accountability Office (USGAO) has found that even seemingly small fees, such as a 1% annual charge, can significantly erode the amount of savings people have for their retirement.[1]   The chart below—which shows the total value of investment after 35 years, assuming $250 contributed monthly with a 6% return—illustrates the impact that differences in fees have on annuity returns over time.



36.     To help combat this abuse, in 2017, the SEC's Enforcement Division formed a Retail Strategy Task Force, concentrating resources and expertise from across the SEC.

37.     Two years later, in 2019, the SEC announced a new initiative, known as "The Teachers' Initiative," to build on its ongoing efforts to protect retail investors through the Retail Strategy Task Force.

---

[1]  GAO Report to the Chairman, Committee on Education and Labor, House of Representatives, *403(b) Investment Options, Fees, and Other Characteristics Varied*, found at https://www.gao.gov/assets/gao-22-104439.pdf (March 2022).

38.     The Teachers' Initiative was designed to build on the SEC's past efforts and focus additional enforcement and investor education resources on behalf of teachers.  Among the program's aims are to educate teachers about savings and investment, investment fees and expenses, retirement programs specific to educators and service members, and to detect and remedy investment fraud.

39.     According to a 2023 report by the USGAO, several states have also recently made efforts to enhance transparency and curb fees paid by participants in 403(b) plans not subject to ERISA requirements.[2]

40.     In that report, the USGAO examined the market for 403(b) plans by analyzing Department of Labor ("DOL"), SEC, and Internal Revenue Service ("IRS") data and documentation; reviewing documentation from five selected states identified as taking actions to improve participant outcomes; interviewing federal and state agency officials and experts; and conducting and analyzing results from surveys of plan sponsors and service providers.

41.     Noting that several industry stakeholders believed that some participants in non-ERISA 403(b) plans did not receive sufficient disclosures that would enable them to make informed investment decisions, the report suggested that it was necessary to enhance transparency through increased disclosure to better inform participants about the fees and expenses they are paying and provide plan participants with a means to access investment options with lower fees and expenses.

---

[2] GAO Report to the Ranking Member, Committee on Education and the Workforce, House of Representatives, *Department of Labor Should Update Educational Materials to Better Inform Plan Sponsors and Participants*, found at https://www.gao.gov/assets/830/827172.pdf (June 2023).

### D. Defendant's EQUI-VEST Annuities

42.     Generally speaking, for each EQUI-VEST variable annuity, the investor makes an initial investment and usually also makes additional periodic investments thereafter, while Equitable agrees to make periodic payments to the investor at retirement that correspond, at least in part, to the performance of sub-accounts that invest in certain underlying mutual fund investments.

43.     Equitable markets EQUI-VEST variable annuities as a retirement product to retail investors nationwide and, in particular, focuses its marketing efforts on K-12 school teachers who invest in the variable annuities through the 403(b) or 457(b) defined contribution retirement plans sponsored by their respective school district employer.

44.     Since 2016, approximately 60% to 65% of Equitable's annual revenue from EQUI-VEST variable annuities originated from investments made by teachers or other employees of K-12 public school districts.

### E. Defendant Issues Misleading Account Statements to Variable Annuity Investors

45.     When an investor purchases an EQUI-VEST annuity, they receive quarterly and calendar year-end statements that show the growth or loss of their annuity value based on the investment sub-accounts that are the basis for growth or loss.  It is Defendant's practice to send these statements to every EQUI-VEST investor.  These statements provide account information, including investment performance information and current account values by investment option. This includes investment details such as the account value at the beginning of the quarter, any contributions and additions, the net investment portfolio results, any withdrawals, and total account value.

46.     Equitable reported fees in four fields within its EQUI-VEST quarterly account statements, but Equitable provided no description in the account statements regarding what these fees included or excluded.

47.     Moreover, Defendant's quarterly statements did not put investors, including Plaintiff and the other Class members, on notice of the Separate Account Expenses and Portfolio Operating Expenses, which were omitted from the account statements.  Investors to whom Equitable provided the account statements included those who considered and made additional investments in EQUI-VEST variable annuities after receiving the account statements.

48.     On the front page of its EQUI-VEST account statements, Equitable included several line items detailing the performance of the annuity, including for "Net Investment Portfolio Results," "Total Account Value," and "Fees and Expenses."  Even though numerous fees were being deducted from investors' accounts, nothing in the account statement advised investors of this; instead, the quarterly account statements reported "Fees and Expenses" on the front page as $0.00 for the quarter, or for both the quarter and year, as shown in the following example:



49.     Equitable's quarterly account statements included a separate section entitled "Transaction Summary by Fund."  This section included a column entitled "Fees and Expenses"

that reported the same Administrative and Transaction Fees as the "Fees and Expenses" line item on the front page of the statement, but on a *pro rata* basis, broken down by each underlying investment fund within the variable annuity. Plaintiff's quarterly account statements reported $0.00 in "Fees and Expenses" for each underlying investment fund.

50.     The "Transaction Summary by Fund" section also included a column entitled "Plan Operating Expenses." This column reported fees—on a *pro rata* basis for each underlying investment fund within the variable annuity—that Equitable deducted and paid to the investor's retirement plan or to a third-party administrator of their retirement plan. Again, Plaintiff's quarterly account statements reported $0.00 in "Plan Operating Expenses" for each underlying investment fund.

51.     The following is an excerpt from Plaintiff's account statement reporting both $0.00 in "Fees in Expenses" and $0.00 in "Plan Operating Expenses" for each underlying investment fund within the variable annuity:

## Transaction Summary by Fund *(con't)*

|  | Balance as of 07/01/2021 | Contributions and Additions | Withdrawals | Fees and Expenses | Net Transfers | Net Investment Portfolio Results | Plan Operating Expenses | Balance as of 09/30/2021 |
|---|---|---|---|---|---|---|---|---|
| EQ/T. Rowe Price Growth Stock | $12,834.17 | $420.00 | $0.00 | $0.00 | $0.00 | ($168.19) | $0.00 | $13,085.98 |
| **Small/Mid Cap** | | | | | | | | |
| EQ/AB Small Cap Growth | $18,124.61 | $630.00 | $0.00 | $0.00 | $0.00 | ($407.74) | $0.00 | $18,346.87 |
| 1290 VT Small Cap Value | $15,682.33 | $630.00 | $0.00 | $0.00 | $0.00 | ($823.53) | $0.00 | $15,488.80 |
| **Bonds** | | | | | | | | |
| EQ/Core Bond Index | $10,268.40 | $630.00 | $0.00 | $0.00 | $0.00 | ($59.11) | $0.00 | $10,839.29 |
| Multimanager Core Bond | $7,029.52 | $420.00 | $0.00 | $0.00 | $0.00 | ($39.47) | $0.00 | $7,410.05 |
| **Guaranteed - Fixed** | | | | | | | | |
| Guaranteed Interest Account | $10,954.48 | $630.00 | $0.00 | $0.00 | $0.00 | $84.54 | $0.00 | $11,669.02 |
| **TOTAL PORTFOLIO** | $95,529.20 | $4,200.00 | $0.00 | $0.00 | $0.00 | ($1,523.66) | $0.00 | $98,205.54 |

52.     Equitable's EQUI-VEST quarterly account statements also included a section entitled "Contribution and Fee Summary."  The "Contribution and Fee Summary" section in Plaintiff's quarterly account statements reported no fees:

### Contribution and Fee Summary

| Trade Date | Salary Reduction Date | Transaction Type | Amount | Units | Unit Value |
|---|---|---|---|---|---|
| 07/02/2021 | Not Provided | Contribution | $700.00 | | |
| | | Guaranteed Interest Account | $105.00 | | |
| | | EQ/Equity 500 Index | $70.00 | 0.0712 | $983.701608 |
| | | EQ/AB Small Cap Growth | $105.00 | 0.1466 | $716.026786 |
| | | EQ/T. Rowe Price Growth Stock | $70.00 | 0.1489 | $470.186940 |
| | | Multimanager Core Bond | $70.00 | 0.4384 | $159.667622 |
| | | EQ/Lg Cap Val Managed Vol | $70.00 | 0.2777 | $252.090957 |

### Contribution and Fee Summary *(con't)*

| Trade Date | Salary Reduction Date | Transaction Type | Amount | Units | Unit Value |
|---|---|---|---|---|---|
| | | EQ/Equity 500 Index | $70.00 | 0.0712 | $983.692052 |
| | | EQ/AB Small Cap Growth | $105.00 | 0.1493 | $703.313914 |
| | | EQ/T. Rowe Price Growth Stock | $70.00 | 0.1491 | $469.416853 |
| | | Multimanager Core Bond | $70.00 | 0.4368 | $160.263452 |
| | | EQ/Lg Cap Val Managed Vol | $70.00 | 0.2825 | $247.817493 |
| | | 1290 VT Small Cap Value | $105.00 | 0.6556 | $160.149254 |
| | | EQ/Core Bond Index | $105.00 | 0.8573 | $122.480934 |

### F.     Defendant's EQUI-VEST Product Features Some of the Highest Fees in the Industry

53.     Defendant hides the fees on its EQUI-VEST for a good reason: EQUI-VEST is a more expensive investment product compared to many other variable annuities and analogous mutual funds sold within 403(b) and 457 plans.

54.     Total operating costs for the EQUI-VEST variable annuity can range from 1.74% to 3.46%.  These fees can add up to annual costs that are as much as 25 times higher than alternative investment options, such as IRA or brokerage accounts funded with exchange traded funds (ETF) or mutual funds, or fixed or variable annuities.  Few products sold within a 403(b) plan feature

- 13 -

fees higher than those on Defendant's EQUI-VEST annuity. Had Plaintiff and the other Class members known of the extent of these fees, they could have re-routed their 403(b) contributions into lower fee investments, thereby saving themselves thousands of dollars in charges.

55. Not only are the fees on the EQUI-VEST product higher than comparable investments, but the fees also severely hamper the growth of the investment, as the investor's account value increases over a period of time. As a fixed percentage, the charge increases with the value of the sub-accounts even though the expenses underlying the charges stay relatively steady.

### Fee Multiples Over Time

| Yr | Account Balance | Annual Fee | Multiple of Year 1 |
|----|----------------|------------|--------------------|
| 1  | $6,185         | $142       |                    |
| 5  | $34,659        | $797       | 5.6                |
| 10 | $80,387        | $1,849     | 13.0               |
| 20 | $220,325       | $5,067     | 35.6               |
| 30 | $463,930       | $10,670    | 75.0               |
| 35 | $646,765       | $14,876    | 104.6              |

56. Worse yet, even if an investor realizes the true expense of the EQUI-VEST product, they have few options to access their money for many years without incurring substantial fees. If an investor surrenders their contract, applies their cash value to a non-life contingent annuity payment option, or withdraws money from the contract within six years following their last contribution, they will be assessed a withdrawal charge of up to 5% of account value withdrawn or contributions withdrawn. For example, if they make a withdrawal in the first year, they could pay a withdrawal charge of up to $5,000 on a $100,000 investment.

### G.     SEC Charges Defendant with Securities Fraud

57.     On July 18, 2022, the SEC announced fraud charges against Equitable Financial Life Insurance Company for providing false statements to approximately 1.4 million variable annuity customers.

58.     The SEC order stated that since at least 2016, Equitable provided quarterly account statements to approximately 1.4 million investors that included materially misleading statements and omissions concerning significant fees paid in connection with variable annuity investments. The SEC's order finds that Equitable violated the antifraud provisions of the Securities Act of 1933, explaining that:

> As a result of the conduct described above, Equitable violated Sections 17(a)(2) and 17(a)(3) of the Securities Act, which prohibit any person in the offer or sale of securities from obtaining money or property by means of any untrue statement of material fact or any omission to state a material fact necessary in order to make statements made not misleading, and from engaging in any practice or course of business which operates or would operate as a fraud or deceit upon the purchaser, respectively.[3]

59.     Equitable consented to settle the charges by providing $50 million in compensation to affected investors, most of whom are public school teachers and other employees of public-school districts who invest in Equitable's proprietary EQUI-VEST variable annuities within 403(b) or 457(b) defined-contribution retirement plans.

60.     To remedy its fraud, as part of the consent order, Equitable was required to immediately modify its EQUI-VEST quarterly account statements, beginning with the quarterly

---

[3]   July 22, 2022 Order Instituting Cease-and-Desist Proceedings, Pursuant to Section 8a of The Securities Act of 1933, Making Findings, and Imposing a Cease-and-Desist Order, found at https://www.sec.gov/files/litigation/admin/2022/33-11083.pdf.

account statements that it provides to investors for the period April 1, 2022 through June 30, 2022, to, among other things:

(a)     clarify that the fees and expenses detailed in the account statements do not include all fees and expenses that the investor pays pursuant to the variable annuity contract;

(b)     add a description of terms section that clarifies the types of fees and expenses detailed in the statement; and

(c)     rename the "Fees and Expenses" item on the front page of the statements to make clear that it refers only to certain plan administration or transactional fees.

## V.     ADDITIONAL INDICIA OF SCIENTER

61.     Before selling a single EQUI-VEST annuity, Defendant knew exactly how its variable annuities operated, the type of fees that it would charge to the investor's account, and how those fees would affect investors' returns.  Internally, before selling its variable annuities, Defendant engaged in a lengthy and comprehensive process that started with product design, moved to financial and profitability testing, and ultimately ended with registration of the product with the SEC.  Indeed, the fraudulent scheme described herein could not have been perpetuated during the Class Period without the knowledge and complicity of, or at least the reckless disregard by, personnel at the highest levels of Equitable.  The product, its structure, and all of the related sales, marketing, and account materials, including the quarterly statement forms, was reviewed and approved by multiple departments within the Equitable, including the actuarial, legal, and marketing departments, before it was sold.

62.     Defendant also ran numerous financial models to understand how its variable annuities would perform in the real world across varying market conditions and to ensure that it would be able to recoup its costs and hit its internal rate of return or profit target.  Defendant's

variable annuities were designed to recoup the fees that were not disclosed in its quarterly statements provided to investors.

63. Additionally, after it began selling the EQUI-VEST annuities, Equitable was made aware that its EQUI-VEST account statements did not disclose the fees paid on the annuity. In May 2017, Equitable and other vendors met with an advisory committee to a school district with which Equitable did the most business in terms of both assets invested and number of investors. This school district was determining whether to renew contracts with its 403(b) vendors. During the May 2017 meeting, the chair of the school district advisory committee told Equitable that the account statements were unclear on the amount of fees investors paid.

64. In May 2019, the school district advisory committee held another meeting at which it specifically asked if Equitable could list annuity fees on the front page of its account statements going forward. Equitable agreed to do so as part of a contract that it entered into with school district covering the period from April 20, 2021 to December 31, 2022. Equitable began listing the Separate Account Expenses and Portfolio Operating Expenses near the end of the account statements for some of the school district's investors in the first quarter of 2020 and for all remaining school district investors by the fourth quarter of 2021.

65. Despite being aware that its statements were misleading, Equitable made **no** changes to the EQUI-VEST account statements that other investors received and instead continued providing them with account statements that reported fees and expenses in the same manner that Equitable had been employing since at least 2016. Even more, Equitable included inserts in its deficient EQUI-VEST quarterly statements encouraging plan participant investors to increase contributions in 2018 and 2019. In other words, Equitable was pointedly made aware that its

statements were misleading and continued to use them while outwardly goading plan participants to increase their investments in the EQUI-VEST products.

## VI.    CAUSATION/RELIANCE

66.     As a matter of company policy, EQUI-VEST provides to its EQUI-VEST variable annuity investors accounts a statement at the close of each calendar quarter and a statement of their contract values at the close of each calendar year.  Other than account-specific details relating to the individual investor, such as their name and address, contract number, and total account value, the statements distributed by Equitable to investors during the Class Period were standardized in their structure, presentation, and content.  As noted above, the statements systematically misled investors, in at least three separate places, about the true fees and charges on their contracts.

67.     Plaintiff reviewed her Equitable account statements in order to assess the returns on her annuity and the impact that fees were having on her investment, and to make decisions concerning her ongoing investments, including whether to make additional investments in her EQUI-VEST variable annuity.  The account statements did not put Plaintiff on notice of the fact that she had paid significant Separate Account Expenses and Portfolio Operating Expenses that amounted to thousands of dollars each year.

68.     Had Plaintiff been aware of the extent of these charges and fees and the effect on the value of her account, Plaintiff (i) would not have made and maintained investments to her EQUI-VEST annuity; (ii) would have ceased contributions to the EQUI-VEST annuity; (iii) would have started contributions to a new vendor; and/or (iv) would have transferred the funds invested in the EQUI-VEST annuity to another 403(b) vendor or product with a different, lower-cost investment product.

## VII.    LOSS CAUSATION/ECONOMIC LOSS

69.    Plaintiff incorporates by reference the allegations set forth above.  During the Class Period (defined below), Defendants publicly disseminated materially false and misleading statements and omitted material facts concerning the existence and amount of the fees and charges being deducted from investors' accounts.  ¶¶45-52.

70.    The undisclosed fees and expenses directly reduced the account value of Plaintiff's and investors' variable annuities.  During the Class Period, investors in Equitable's EQUI-VEST variable annuities, including Plaintiff, were charged the following fees on their accounts:

> Separate Account Expenses: EQUI-VEST investors pay on an ongoing basis for mortality and expense risks associated with the variable annuity and administrative and financial accounting costs.  Equitable deducts Separate Account Expenses on a daily basis at an annual rate ranging from approximately 0.10% to 1.49% of net assets in the variable investment options.

> Portfolio Operating Expenses: These expenses are paid by all EQUI-VEST investors on an ongoing basis and are charged by the investment funds underlying the variable annuity for management fees, fees for the marketing and selling of mutual fund shares, service fees, and/or other expenses.  The underlying investment funds deduct Portfolio Operating Expenses on a daily basis at an annual rate ranging from approximately 0.55% to 2.26% of the amount invested in such investment funds.

71.    Defendant misled Plaintiff and the other Class members into investing money into its EQUI-VEST variable annuities and as a result of this deception, Plaintiff and the other Class member have paid thousands of dollars of undisclosed charges and fees.

## VIII.   CLASS ACTION ALLEGATIONS

72.    Plaintiff brings this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rule of Civil Procedure, on behalf of a class defined as all persons or entities who, at any time between July 15, 2019 and July 18, 2022 (the "Class Period"), invested in and/or made contributions to an EQUI-VEST variable annuity (the "Class").

- 19 -

73. Excluded from the Class are Defendant, the officers and directors of Equitable at all relevant times, members of their immediate families, and their legal representatives, heirs, successors, or assigns, and any entity in which Defendant has or had a controlling interest.

74. The members of the Class are so numerous that joinder of all members is impracticable and the disposition of their claims in a class action will provide substantial benefits to the parties and the Court. According to the SEC consent order, Equitable provided misleading quarterly statements to nearly 1.5 million investors in its EQUI-VEST annuities. Members of the Class may be identified from records maintained by Defendant and may be notified of the pendency of this action by mail or electronically. Defendant regularly communicates with investors in its EQUI-VEST annuities by mail and/or electronically.

75. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendant's wrongful conduct in violation of federal law that is complained of herein.

76. Plaintiff will fairly and adequately protect the interests of the other Class members and has retained counsel competent and experienced in class and securities litigation.

77. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class of the Class. Among the questions of law and fact common and predominant to the Class are:

(a) whether Defendant violated the Exchange Act, as alleged herein;

(b) whether Defendant employed any device, scheme, or artifice to defraud its EQUI-VEST investors;

(c)     whether Defendant made any untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading;

(d)     whether Defendant engaged in any act, practice, or course of business which operates or would operate as a fraud or deceit upon its EQUI-VEST investors; and

(e)     to what extent the members of the Class have sustained damages and the proper measure of damages.

78.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## IX.     CLAIM ALLEGED

### COUNT I
### For Violation of §10(b) of the Exchange Act and Rule 10b-5

79.     Plaintiff incorporates by reference Paragraphs 1-78, above, as though fully set forth herein.

80.     During the Class Period, Defendant disseminated or approved the statements specified above, which it knew or deliberately disregarded were false and misleading in that they contained misleading statements and omitted material facts concerning significant fees paid in connection with its EQUI-VEST variable annuities.

81.     Defendant violated §10(b) of the Exchange Act and Rule 10b-5 in that it:

(a)     employed devices, schemes, and artifices to defraud;

- 21 -

(b)    made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their investment contributions to the EQUI-VEST variable annuities during the Class Period.

82.    Plaintiff and the other Class members have suffered damages, in that they were assessed charges and fees that were not disclosed on their quarterly statements and the diminished value of their accounts and any subsequent contributions as a result of such charges and fees. Had Plaintiff and the other Class members been aware of the extent of the fees and charges and their effect on the value of their accounts, they would have ceased contributions to the EQUI-VEST annuity, started contributions to a new vendor, and/or transferred the funds invested in the EQUI-VEST annuity to another 403(b) vendor or product with a different, lower-cost investment product.

## X.    REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests relief and judgment, as follows:

A.    Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure, and appointing Plaintiff's counsel as Lead Counsel;

B.    Awarding compensatory damages in favor of Plaintiff and the other Class members against Defendant for all damages sustained as a result of Defendant's wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding recessionary damages and/or the disgorgement of profits obtained by Defendant sustained as a result of Defendant's wrongdoing, in an amount to be proven at trial, including interest thereon;

D.    Awarding Plaintiff and the other Class members their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

E.    Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## XI.    DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a jury trial as to all claims so triable.

DATED:  July 15, 2024                    Respectfully submitted,

                                         _____
                                         s/ ADAM J. LEVITT
                                         ADAM J. LEVITT

                                         Adam J. Levitt
                                         Eaghan Davis
                                         **DiCELLO LEVITT LLP**
                                         Ten North Dearborn Street, Sixth Floor
                                         Chicago, IL  60602
                                         Tel.:  312-214-7900
                                         alevitt@dicellolevitt.com
                                         edavis@dicellolevitt.com

                                         Steven M. Jodlowski
                                         Hani Farah
                                         **DiCELLO LEVITT LLP**
                                         4747 Executive Drive, Suite 240
                                         San Diego, CA  92121
                                         Tel.:  619-923-3939
                                         sjodlowski@dicellolevitt.com
                                         hfarah@dicellolevitt.com

- 23 -

Manfred Muecke
**MANFRED APC**
600 West Broadway, Suite 700
San Diego, CA  92101
Tel.:  619- 550-4005
mmuecke@manfredapc.com

*Counsel for Plaintiff and the Proposed Class*

# APPENDIX A

## CERTIFICATION OF PLAINTIFF PURSUANT TO THE FEDERAL SECURITIES LAWS

I, Laura Devlin, hereby certify under penalty of perjury that the following is true and correct to the best of my knowledge, information and belief:

1.      I have reviewed the Complaint and authorized its filing.

2.      I did not purchase any security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under the federal securities laws.

3.      I am willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      I opened the EQUI-VEST variable annuity contract that is the subject of this action on June 30, 2003.  During the class period, I made the following transactions in the security that is the subject of this action.  *See* attached Schedule A.

5.      I ceased contributions to the EQUI-VEST annuity in late 2021 and in the first quarter of 2022 transferred my funds to another vendor. At the beginning of 2022, my total account value was $103,501.

6.      I have not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification.

7.      I will not accept any payment for serving as a representative party on behalf of the class beyond my pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

1

Pursuant to the laws of the United States of America (28 U.S.C. §1746), I declare under penalty of perjury that the fore going statements are true and correct to the best of my knowledge. Executed this 11th day of July, 2024, in Elgin, Illinois.

LAURA DEVLIN

**SCHEDULE A**

**Plaintiff's Transactions in Equi-Vest**

| Date | Amount |
|------|--------|
| 7/12/2019 | $500 |
| 8/2/2019 | $500 |
| 8/13/2019 | $500 |
| 8/27/2019 | $500 |
| 9/18/2019 | $500 |
| 10/1/2019 | $500 |
| 10/21/2019 | $500 |
| 11/5/2019 | $500 |
| 11/12/2019 | $500 |
| 11/27/2019 | $500 |
| 12/17/2019 | $500 |
| 12/24/2019 | $500 |
| 1/14/2020 | $500 |
| 1/31/2020 | $500 |
| 2/13/2020 | $500 |
| 3/2/2020 | $500 |
| 3/17/2020 | $500 |
| 3/27/2020 | $600 |
| 4/16/2020 | $600 |
| 4/29/2020 | $600 |
| 5/18/2020 | $600 |
| 5/29/2020 | $600 |
| 6/18/2020 | $600 |
| 7/2/2020 | $600 |
| 7/22/2020 | $600 |
| 7/30/2020 | $600 |
| 8/25/2020 | $600 |
| 9/1/2020 | $600 |
| 9/18/2020 | $600 |
| 10/2/2020 | $600 |
| 10/15/2020 | $700 |
| 10/30/2020 | $700 |
| 11/20/2020 | $700 |
| 12/03/2020 | $700 |
| 12/21/2020 | $700 |
| 1/7/2021 | $700 |
| 1/14/2021 | $700 |
| 2/2/2021 | $700 |
| 2/12/2021 | $700 |
| 3/5/2021 | $700 |

1

| 3/22/2021 | $700 |
|-----------|------|
| 4/5/2021 | $700 |
| 4/19/2021 | $700 |
| 4/30/2021 | $700 |
| 5/14/2021 | $700 |
| 6/1/2021 | $700 |
| 6/18/2021 | $700 |
| 7/2/2021 | $700 |
| 7/16/2021 | $700 |
| 7/29/2021 | $700 |
| 8/16/2021 | $700 |
| 9/3/2021 | $700 |
| 9/20/2021 | $700 |
| 10/4/2021 | $825 |
| 10/12/2021 | $825 |